260-12

STATE OF MAINE
CUMBERLAND, ss.

UCD
DOCKET NO. CR-11-7974

STATE OF MAINE

v.

ABDIAZIZ DAHIR

ORDER ON
MOTION TO SUPPRESS

## Introduction

Pending is Defendant Dahir's Motion to Suppress arising out of his arrest on December 8, 2011. A hearing on the Motion to Suppress took place on April 24, 2012. The State presented the testimony of Westbrook detectives Steven Crocker and Kurt Bosse. In his motion, the Defendant contends that his initial detention was not supported by reasonable articulable suspicion, nor was his subsequent arrest supported by probable cause. In addition, Defendant contends that he did not validly waive his Miranda rights and that his statements to the police were not voluntary. For the reasons set forth below, the court denies Defendant's Motion to Suppress.

## Facts

Detectives Crocker and Bosse testified generally to the following facts: At approximately 4:00 a.m. on December 8, 2011, the victim, Michael Rulman, a taxi cab driver, picked up three black males in Portland and drove them to Brackett Street in Westbrook. While in route, the three passengers spoke about visiting the "BM" of one of the three. (Detective Crocker testified that "BM" is street parlance for "Baby Mama" i.e., the mother of someone's child).

When the taxi arrived at the intersection of Brackett and Prospect Streets in Westbrook, the front street passenger pulled out a knife and held it to the victim's throat while demanding his money. The victim complied and produced the contents of his pockets while the front seat passenger cut the microphone cord to the taxi radio. The two rear passengers then held knives to the back of the victim's neck. The victim fled the car and was pursued for a short distance by the front seat passenger. The front

recvd. 6-7-12

seat passenger then ran in the direction of Westbrook Gardens with the other two passengers. The assailants took Mr. Rulman's cellphone with them whn they fled.

Police initially attempted to follow the path of the suspects with a police dog, but that attempt was unsuccessful. The victim was then taken to the Westbrook Police Department where he provided a statement and described the assailants. Mr. Rulman described the front seat passenger as a tall, about 6' 2," light skinned black man wearing an "Air Force style hat," which had fur on the front and earflaps and may have been green. The front seat passenger was also described as wearing a puffy coat.

Mr. Rulman described one backseat passenger as being about 5' 8" tall, 140-150 pounds with dark skin, wearing a green parka with a hood. Mr. Rulman did not see the other backseat passenger sufficiently to describe him.

Mr. Rulman's cell phone was located in the vicinity of Brackett Street that morning. At approximately 2:00 p.m. that same day, Detectives Crocker and Bosse did a drive-by of the area where the incident had occurred. As they drove up Brackett Street, they saw three black males walking together. One was approximately 6' 2" tall wearing a puffy coat. The other two males were shorter. Thus, the three males generally matched the description given by Mr. Rulman. The detectives stopped the three males and one was identified as the Defendant Dahir. After the males were advised of the nature of the police investigation, all three denied having taken a cab to that area that morning. The males stated that, instead, they had stayed all night at the residence of the "BM" of one of them. She was identified as Leanna Alexander, who resided nearby in Westbrook Gardens. They said that they had ordered pizza at her residence.

While Detective Bosse went to contact Leanna Alexander at her residence, approximately two tenths of a mile away, Detective Crocker remained on Brackett Street with the three males, as well as three more uniformed Westbrook Police Officers who had arrived as backup. While Detective Bosse was pursing the investigation, two of the males, including the Defendant, complained about being cold and one of the Westbrook Officers offered to let them sit in his cruiser to stay warm. The window was left partially opened so that the two could let the officers know if they wished to leave

2

the cruiser. None of the defendants were in handcuffs and neither of the defendants in the cruiser asked to leave it. Detective Bosse did not find Ms. Alexander at her residence, but spoke with a neighbor who reported seeing the three males leaving that residence earlier.

Within a few minutes, Detective Bosse returned to the scene where the Defendant was waiting in the police cruiser. One of the males, David Martinez, provided the cell phone number of Ms. Alexander. Detective Bosse then called Ms. Alexander and was told that the three males had, in fact, not been at her residence all night. Ms. Alexander stated that, instead, the three males had arrived at approximately 5:00 a.m. pounding on the door to be let in. Ms. Alexander stated that the three males sounded like "5-0," which Detectives Crocker and Bosse testified meant that the three males were pounding so loudly that Ms. Alexander thought the police were at her door.

Detective Bosse then made contact with Ms. Alexander at a nearby convenience store. She accompanied him to her residence where she gave consent to a search. During that search, the detectives located an Air Force style hat, a "Somali Pirates" t-shirt, Mr. Rulman's cut up driver's license, as well as Rulman's Sears card and his AARP card. The detectives also located a knife that Ms. Alexander stated was not hers. The detectives further found pizza boxes that corroborated that the three males had ordered pizza from Ms. Alexander's residence that day.

While the consent search of Ms. Alexander's residence was in progress, the Defendant and a juvenile co-defendant were detained and taken to the Westbrook Police Department. The other male defendant, Martinez, was arrested for violating a protection order for having contact with Ms. Alexander.

Detectives Crocker and Bosse then proceeded to the Westbrook Police Department where they conducted an interview of Defendant Dahir, which was recorded by video. A DVD containing that video was admitted into evidence at the hearing. As requested by the State and by the Defendant, the Court reviewed the first twenty minutes of the video after the testimonial hearing on the Motion to Suppress was completed. At the outset of the interview, Detective Crocker read the Defendant

3

his Miranda rights and obtained a written waiver of those Miranda rights. During the interview, the Defendant initially denied being in the cab, but later confessed to being in the backseat during the robbery and fleeing the scene. Throughout the portion of the interview viewed by the Court, the Defendant appeared calm and was not noticeably upset. Detectives Crocker and Bosse did not make any promises and did not threaten or coerce the Defendant.

Detectives Crocker and Bosse testified that approximately 45 minutes elapsed from the time they first encountered the three males on Brackett Street to the time they interviewed the Defendant at the Westbrook Police Station.

## Discussion

1. **Detectives Crocker and Bosse had reasonable articulable suspicion to stop and question the Defendant.**

"Law enforcement officers are justified in making an investigatory stop if, at the time of the stop: (1) [they have] 'articulable suspicion' of criminal activity; and (2) [that] suspicion is 'objectively reasonable in the totality of the circumstances.'" State v. Lear, 722 A.2d 1266, 1267 (Me. 1998) (quoting State v. Brown, 694 A.2d 453, 455). Reasonable articulable suspicion to conduct an investigatory stop, as well as probable cause for detention, can rest on the collective knowledge of the police. State v. Carr, 704 A.2d 353, 356 (Me. 1997).

The detectives here had information from Mr. Rulman, the victim, that he had been robbed on Brackett Street at knifepoint at approximately 4:00 a.m., by three black males, one approximately 6' 2" tall wearing a puffy coat, while the other males were shorter. After the robbery, the three suspects had run off in the direction of Westbrook Gardens. When the detectives had searched the area earlier that day, they had found the victim's cell phone in the area of Brackett Street. With that knowledge, the detectives had reasonable articulable suspicion to stop the Defendant and his two companions when they spotted them on Brackett Street at approximately 2:00 p.m. Thus, the initial investigatory stop was valid.

4

The court also finds that the initial stop did not at any point turn into an unlawful detention. The Defendant and his juvenile companion waited at the scene for somewhere between 30 and 45 minutes while Detective Bosse went to Ms. Alexander's residence, returned, and spoke with Ms. Alexander on the telephone after obtaining her number from Mr. Martinez. It was Defendant's choice to wait in the cruiser to stay warm. He would have been allowed to leave the cruiser if he had requested.

2. **There was probable cause to arrest the Defendant by the time he was transported to the Westbrook Police Station.**

Probable cause exists when the facts and circumstances within the collective knowledge of the police would warrant a prudent and cautious person to believe that a crime has been or is being committed. State v. Flint, 12 A.3d 54 (Me. 2011). In addition to the facts referenced above, at the time the Defendant was transported to the Westbrook Police Station the officers were aware that Ms. Alexander had contradicted the story given by the Defendant and his companions. The officers had learned that defendants, instead of being there all night as they had stated, had arrived at approximately 5:00 a.m., shortly after the accident, knocking at the door in such a loud fashion that Ms. Alexander thought the police were trying to gain entry. That would be consistent with the Defendant and his companions being in flight from the robbery. That set of facts was sufficient to provide probable cause for the Defendant's arrest.

3. **The Defendant was properly informed of his Miranda rights, validly waived those rights, and his subsequent statements were voluntary.**

Based on the testimony of Detectives Bosse and Crocker and the State's exhibits A and B admitted into evidence at the hearing, the Court finds that Detective Crocker properly informed the Defendant of his Miranda rights and the Court further finds that the State has demonstrated beyond a reasonable doubt that the Defendant voluntarily, knowingly, and intelligently waived those Miranda rights. The Court also finds that the State has proven beyond a reasonable doubt that the subsequent statements made by the Defendant were voluntary.

5

## Conclusion

The entry will be:

Defendant's Motion to Suppress to Suppress is denied.

DATED:     June 7, 2012

_____
Richard W. Mulhern
Judge, Maine District Court